UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KARAM PRASAD, LLC d/b/a/ BISHOP OF SEVENTH,<br><br>Plaintiff,<br><br>- against -<br><br>CACHE, INC.,<br><br>Defendant. | Case No. 07 CV 5785 (PAC) (JCF)<br><br>**PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION (ELECTRONICALLY FILED)** |

## INTRODUCTION

Plaintiff Karam Prasad, LLC submits this reply memorandum in further support of its motion for a preliminary injunction to enjoin Defendant Cache, Inc. In opposition to that motion, Defendant has submitted a 19-page memorandum and two supporting declarations that, significantly, never deny the obvious fact in this case that Defendant copied Plaintiff's product. Further, Defendant refuses to voluntarily stop selling even the dwindling supply of its copies and refuses to agree to not sell more such copies when that supply is depleted. Hence, irreparable harm is present because Plaintiff has shown that a likelihood of confusion is present. Defendant's backstop defense to Plaintiff's showing is to proclaim that Plaintiff's trademark is not a trademark, but that assertion is contrary to the well-recognized trade customs that regard fanciful stitching on the back pockets of jeans as source identifiers.

Plaintiff brought this motion under New York common law to expedite and simplify the issues. Because that law does not require a showing of secondary meaning, Plaintiff does not need to submit evidence such as sales revenue and advertising

expenditures (*see* Def. Mem. p. 13) for which the data is confidential business information. That confidentiality would have required additional time in negotiating a protective order with Defendant and filing the data under seal. While Defendant argues that Plaintiff is hiding a lack of secondary meaning, it ignores the case law stating that secondary meaning, as well as a likelihood of confusion, is presumed because of Defendant's blatant copying. In view of that copying, Plaintiff chose the more effective tool for the task since the New York common law focuses on the unfair practices that establish unfair competition. Defendant's other misstatements are addressed below.

## ARGUMENT

### Plaintiff Seeks A Prohibitory Injunction

The briefs of both parties have cited the same case that states the applicable standard: *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 114 (2d Cir. 2006).

> A preliminary injunction is usually prohibitory and seeks generally only to maintain the status quo pending a trial on the merits. …[I]n the typical trademark case a prohibitory injunction seeks to stop alleged infringement.

Defendant confuses the status quo. McCarthy's treatise states the following:

> The status quo to be preserved is not the situation of contested rights, but the last, peaceable, noncontested status of the parties. In a trademark case, the status quo ante litem to be preserved is the situation prior to the time the junior user began use of its contested mark: the last peaceable, noncontested status. J. Thomas McCarthy, 5 McCarthy on Trademarks and Unfair Competition § 30:50 (4th Ed. 2007).

Defendant cannot argue that the status quo is its continued infringement. "The interpretation of this concept that [defendant] advocates would lead to absurd situations, in which plaintiffs could never bring suit once infringing conduct had begun."

2

*GoTo.com, Inc. v. Walt Disney Co.,* 202 F.3d 1199, 1210 (9th Cir. 2000). Based on the applicable standard, Plaintiff is required to only show a likelihood of success on the merits. *Louis Vuitton,* 454 F.3d at 114.

**Plaintiff Has Not Delayed In Its Actions**

This is not a case wherein Plaintiff has rested on its rights. As stated in Mr. Prasad's Declaration, Plaintiff first "heard" of Defendant's product on May 12, 2007 and thereafter obtained samples and consulted with counsel (¶ 7), which resulted in Plaintiff's May 22 demand letter that was delivered by hand and email to Defendant's counsel (Exhibit I, ¶ 10 Culver Decl.). When no response was received, Defendant's counsel was telephoned and she indicated a response would be made by May 30 or 31 (Exhibit J, ¶ 11 Culver Decl.). After two further emails to Defendant's counsel on June 1 and 4, again without a response (*id.*), Plaintiff filed suit on June 19. When Defendant requested a two week extension to respond to the Complaint (Docket # 4, filed July 5), it became apparent that not even the filing of the Complaint was going to prompt a response to Plaintiff's request to stop the copying, and thus Plaintiff began preparations for its motion. As shown by the supporting Declarations signed on July 17, Plaintiff was prepared at that time to request relief, but undertook the necessary procedure for a pre-motion conference that resulted in the conference on August 7.[1] Under Your Honor's Individual Practices, Rule #3 B, Defendant's submission of its pre-motion conference letter stayed the time for Defendant's filing of its response to the complaint so that it was not in default. That

---

[1] It is disingenuous for Defendant to argue (Mem. p. 4) that Plaintiff delayed by choosing the latest date of the four dates offered by the Court for a conference when Defendant's counsel was not available on the second and third dates offered. *See* July 25 email from Defendant's counsel to Plaintiff's counsel, Exhibit C to Duvdevani Declaration.

3

same logic dictates that the time after Plaintiff's July 19 pre-motion conference letter is not counted as any delay against Plaintiff.

Plaintiff took timely and reasonable measures in attempting to resolve this controversy without resorting to the courts, and thus the time involved in that attempt does not weigh against the relief sought. *See Ryan v. Valpone Stamp Co., Inc.*, 107 F.Supp.2d 369, 404 (S.D.N.Y. 2000) ("Plaintiff expressed its objections to Defendant's continued use of his name and image on at least two occasions and promptly commenced the instant action") (citing *King v. Innovation Books,* 976 F.2d 824, 831 (2d Cir. 1992)). The Second Circuit in *King* noted that the plaintiff made no such objection in the principal case relied upon by Defendant (Mem. p. 3-5), *Citibank, N.A. v. Citytrust,* 756 F.2d 273 (2d Cir. 1985). *King* also refers to that plaintiff's delay in bringing suit as extending for nine months, after learning of the defendant's intentions, rather than the ten-week period between plaintiff's seeking an injunction and confirmation of the defendant's store opening.[2]

Defendant offers the rule that "unexplained delays of more than two months" may affect granting of a preliminary injunction (Mem. p.5) (citing *Gidatex, S.R.L. v. Campaniello Imports, Ltd.,* 13 F.Supp.2d 417, 419 (S.D.N.Y. 1998)). The present facts are not within the scope of that assertion. *Gidatex* also stated, "A finding of inexcusable delay in trademark cases is most likely when the circumstances of the case permit an inference that the owner has timed the request for injunctive relief so as to

---

[2] *Citibank* is further distinguishable from the present case with respect to the resources of the plaintiff: "It strains one's credulity to argue that a major financial institution such as Citibank, with all of its resources and information sources, could not establish ... that a potential competitor had opened a branch more than ten weeks earlier near the heart of Citibank territory."756 F.2d at 277.

4

inhibit competition." *Id.* Again, those facts are not present here (particularly in view of Defendant's dwindling inventory) to render the time involved as unexplained and inexcusable.

Without any supporting authority, Defendant asserts the presumptuous argument that Plaintiff was on "constructive notice" of Defendant's first sales (Mem. p. 3). However, Defendant also argues that Plaintiff and Defendant are not competitors (Mem. p.14) which undercuts the notion that Plaintiff had any knowledge of those first sales. Plaintiff is an up-and-coming designer and manufacturer, while Defendant is a retailer, and thus they do not compete in the way that would make them likely to have readily available knowledge of one another, but they do compete in the sense of head-to-head competition in offering women's blue jeans. Unlike Citibank (*see* footnote 2), Plaintiff does not have unlimited resources and information sources that would make it aware of Defendant's sales.[3]

### Plaintiff's Irreparable Harm Is Increased By Defendant's Continued Sales

The Second Circuit has stated that, "except in 'rare cases,' irreparable harm 'almost invariably' follows from likelihood of confusion." *King*, 976 F.2d at 831 (quoting *Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 41-42 (2d Cir. 1986)). Defendant does not advance any argument that this is the "rare" case that may impact on Plaintiff's showing on likelihood of confusion as controlling on the irreparable harm for the requested relief. Instead, Defendant advances

---

[3] Defendant weakly asserts that Plaintiff's claims "may " be barred by laches (Mem. p. 3, n.1). However, since Defendant has not denied its intentional copying of Plaintiff's products, and thereby its trading on Plaintiff's goodwill, Defendant is not entitled to

the very ordinary argument that it would like to continue selling its products regardless of Plaintiff's protests.

Defendant does not dispute that it was selling the subject jeans for $88. At the pre-motion conference before this Court on August 7, 2007, Defendant's counsel made the representation that Defendant was then selling these jeans for $44. This half-price fire sale threatens to harm Plaintiff's goodwill even more by creating an inferior image for Plaintiff's high quality and more expensive jeans.

Defendant's alleged inventory of 651 pairs of jeans does not negate the irreparable harm that is present. There is a further reason to continue with granting preliminary relief in that it may effect Plaintiff's monetary recovery as illustrated in *George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532 (2d Cir. 1992). Therein, the defendant appealed the monetary award to plaintiff, and the plaintiff cross-appealed the district court's order for an injunction.

> Finally, we cannot fault the district court for allowing [defendant] to liquidate its remaining inventory without requiring the defendant to account for the profits on those sales. Our approval stems largely from the fact that [plaintiff] never moved for a preliminary injunction to restrain [defendant's] use of the trade dress in question. Actions speak louder than words, and motions speak loudest of all. Since [plaintiff] itself concluded that the economic loss it was suffering, if any, did not warrant a remedy from the outset, we cannot say that the district court abused its discretion in allowing [defendant] to sell off its remaining cans and retain the profits. 968 F.2d at 1542.

In any later accounting for monetary relief in this case, Defendant's additional 651 pairs of jeans should be included and also included within a final injunction.

---

invoke the defense of laches. *See Hermes Int'l v. Lederer de Paris Fifth Avenue, Inc.*, 219 F.3d 104, 107 (2d Cir. 2000).

**Plaintiff Has Valid Trademarks and Trade Dress**

Plaintiff brought this motion for Defendant's infringement of the pocket mark, the composite mark (pocket mark and inlaid crystals), and the crystal trade dress. Plaintiff substantiated that designer jeans are surging in popularity and "typically feature prominently visible designer names or logos on the back pockets." Exhibit K, ¶ 12 Culver Decl. *See also* Exhibit L (Business Week at ¶ 15 thereto, "The design, for example, is a classic fashion staple. You start with the standard Levi's 501 and add distinguishing traits, such as back pocket stitching or seams" and New York Times at ¶ 3 thereto, noting the jean's success "has a lot to do with the back pocket [logo]"), and Exhibit M ("the quest for creating a standout back pocket is more important than ever"). Defendant has to be well aware of these fashion trends.

To give a particular human voice for these obvious trends, Plaintiff submits the accompanying Declaration of Adriano Goldschmied who has over three decades of experience in the field and has won awards including Sportswear International's "Best Women's Jeans" for 2002, 2003 and 2004. Based on his professional experience, Mr. Goldschmied opines that the stitching design on the pocket of Plaintiff's jeans would be recognized as a trademark by persons in the trade, purchasers and potential purchasers. *Id.* at ¶ 3. These purchasers and persons are accustomed to looking for and recognizing trademarks on the pockets of premium jeans and Plaintiff's signature design fits into those market expectations. *Id.* at ¶ 4.

In challenging the validity of Plaintiff's trademarks, Defendant makes several unrelated statements. First, Defendant has not shown any weakness in the underlying legal principle in New York common law, that secondary meaning is not required, by its

7

attempt to factually distinguish various cases (Mem. p.7).  Second, Defendant argues that its use of the CACHE name alleviates the likelihood of confusion (Mem p.8-9).  As stated in the case it relies upon, such use must "prominently" display any distinguishing name. *Stormy Clime, Ltd. v. Progroup, Inc.*, 809 F.2d 971, 977 (2d Cir. 1987).

For example, in recognizing that "when a similar mark is used in conjunction with a company name, the likelihood of confusion may be lessened," the Second Circuit relied on the facts that the common words at issue (sport and stick) were one-third the size of the distinguishing house mark (Right Guard) and were the same size as the generic wording (deodorant). *W.W.W. Pharmaceutical Co., Inc. v. Gillette Co.*, 984 F.2d 567, 573 (2d Cir. 1993). *See also Astra. Pharm. Prod., Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1205 (1st Cir. 1983) ("[O]therwise similar marks are not likely to be confused where used in conjunction with the clearly displayed name and/or logo of the manufacturer"); *Hernri's Food Prods. Co., Inc. v. Kraft, Inc.*, 717 F.2d 352, 355-56 (7th Cir. 1983) ("Yet even Kraft agrees that a prominent housemark may also tend to lessen confusion").

Defendant invites the Court's examination of the jeans at a hearing; however, that examination should confirm that the hang tag is removable, the CACHE name is on the inside and not visible post-sale and otherwise shown in vastly smaller lettering compared to the prominent use of the back pocket design as copied from Plaintiff.

This case is not about utilitarian functionality at issue in *Stormy Clime* wherein the product features worked better; or aesthetic functionality for ornamental designs such as the "fall colors or motifs, squirrels or leaves" at issue in *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1006 (2d Cir. 1995).  Plaintiff's pocket stitching is an abstract design,

8

not representational art such as a butterfly, rainbow or flower used for decoration. For the reasons stated in Plaintiff's memorandum, p. 12, the mark is a fanciful, strong source indicator. Nor is this case concerned with product configuration trademarks; Plaintiff's pocket design is more akin to a traditional garment label bearing words and/or designs that act as trademarks. The pocket design is like a garment label attached on the outside rather than the inside of the garment, so attached to meet market expectations, but not controlling of the physical design of the garment itself. Defendant concedes that it bears the burden of proof on functionality (Mem. p. 8) and that it "has not had the opportunity to fully prove functionality" (Mem. p. 10). The materials submitted by Plaintiff clearly show alternative designs as proof of non-functionality; however, Defendant makes a semantic argument that the author's use of the word "designs" is not "trademarks." In the market place of designer jeans, that argument rejects the obvious link between the two.

### The Polaroid Factors Support The Likelihood Of Confusion

Defendant concedes, as it must, that the marks are similar (Mem p. 13) and identify denim jeans (Mem. p. 14). Plaintiff, located in New York, has alleged that it first used its pocket trademark at a fashion show in New York City. The parties obviously compete in at least that vicinity and thus are not geographically remote. Defendant's speculation that female purchaser's do not migrate between $88 and $200 for an article of clothing is belied by a common sense of such migration in shoes, jewelry or handbags, for example. As to the strength of the mark, the Second Circuit has recognized that the factors are flexible, *e.g. Louis Vuitton,* 454 F.3d at 118, and thus when the substantive law dictates that a showing of secondary meaning is not required, it would be improper analysis to import the panoply of strength when it is not necessary. Defendant's

anticipation of evidence of actual confusion is misplaced given the limited time frames of use and knowledge of the controversy, and, moreover, such evidence is not required.

"Good faith can be found if a defendant has selected a mark which reflects the product's characteristics, has requested a trademark search or has relied on the advice of counsel." *W.W.W. Pharmaceutical*, 984 F.2d at 575. Defendant has not offered evidence to exhibit such good faith. Defendant refers to "generic stitching found on the jean pockets" (Mem. p. 8), (adopting Judge Friendly's classification system), but does not say how the stitching is generic—what genus or article does it name. Defendant says it is not a counterfeiter on the street corner (Mem. p. 15), but in contrast to such counterfeiters, the Second Circuit found "[m]ore confusing, and thus more troublesome, is the sale of copies by respected retailers." *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 165 (2d Cir. 1991). Defendant provides no convincing explanation for its troublesome copying.

Defendant's reliance on sophisticated purchasers is misplaced. The courts in *Coach Leatherware*, 933 F.2d at 170, and *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986), found that the sophisticated consumer likely to assume some sort of association between the parties when faced with copying. Defendant particularly relies on purchasers of expensive perfumes as a model, but those purchasers "are often assisted by retail selling specialists and beauty advisors" (Mem. p. 17) that are not applicable here.

## **CONCLUSION**

In view of the foregoing, and for the reasons stated in Plaintiff's opening memorandum, Plaintiff's motion for a preliminary injunction should be granted.

Dated: Arlington, Virginia
       August 20, 2007

**MILLEN, WHITE, ZELANO & BRANIGAN, P.C.**
Attorneys for Plaintiff

By: s/Michael S. Culver
    Michael S. Culver
    (admitted *pro hac vice*)
    culver@mwzb.com
2200 Clarendon Blvd., Ste. 1400
Arlington, VA 22201-3360
(703) 243-6333 tel.
(703) 243-6410 fax.

**EDWARD F. WESTFIELD, P.C.**
Attorneys for Plaintiff
    Edward F. Westfield Jr.
    (EW1625)
    efwjr@efwpc.com
274 Madison Avenue, Suite 1601
New York, NY 10016-0701
(212) 532-6625 tel
(212) 532-6627 fax

TO:   NIXON PEABODY LLP
       Attorneys for Defendant
       Attn: Tamar Duvdevani, Esq.
       (tduvdevani@nixonpeabody.com)
       437 Madison Ave., Fl. 23
       New York, NY 10022-7039
       (212) 940-3000 tel
       (212) 940-3111 fax